**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 17, 2010

**BY HAND DELIVERY**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:    United States v. Alton Davis,
                 S1 06 Cr. 911 (WHP)

Dear Judge Pauley:

      The Government respectfully submits this letter in advance of defendant Alton Davis's sentencing scheduled before Your Honor on August 20, 2010.

      Davis was convicted on May 3, 2010, following an eight-day trial before this Court, and a jury, of criminal charges resulting from his participation in a conspiracy to commit armed robberies of marijuana dealers, including two specific robberies where Davis viciously shot and killed a victim. Davis testified at trial and committed blatant perjury. The Government respectfully submits that the defendant's United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range should include a two-level increase for obstruction of justice. Although this enhancement does not change the applicable sentencing range under the Guidelines, as a matter of justice, Davis's perjury should not pass by without acknowledgment by the Court. Perjury at trial is a serious matter, and should be taken into account at Davis's sentencing. The Government respectfully requests that Court impose a sentence of life imprisonment on each of the murder counts that Davis was convicted of committing, and that the Court order that those sentences be served consecutively to each other and to the sentences on the other counts of conviction.[1]

---

[1] Davis proceeded to trial with his co-defendant Roderick Gunn, a/k/a "Zappa" ("Gunn"), who is also scheduled to be sentenced on August 20, 2010. Sentencing issues related to Gunn will be addressed in a separate submission.

The Honorable William H. Pauley III
August 17, 2010
Page 2

## BACKGROUND

### A.     The Charges

Indictment S1 06 Cr. 911 (WHP), filed on August 16, 2007 (the "Indictment"), charged Davis and Gunn in the following counts: (1) Davis and Gunn, together with co-defendants Derrilyn Needham, a/k/a "Ingrid" ("Needham"), and Ronald Knibbs, a/k/a "Birdie" ("Knibbs"), were charged with participating in a conspiracy from in or about July 2002 through in or about January 2003 to commit Hobbs Act robberies of suspected drug dealers, including: (i) a robbery at a residence located at 194 Locustwood Boulevard, Elmont, New York, on or about October 31, 2002 ("Elmont Robbery"); and (ii) a robbery at a residence located at 4385 Wickham Avenue, Bronx, New York, on or about January 21, 2003 ("Wickham Robbery"), in violation of Title 18, United States Code, Section 1951 (Count One); (2) Davis, Gunn, and Needham were charged with committing, and attempting to commit, the Elmont Robbery, in violation of Title 18, United States Code, Sections 1951 and 2 (Count Two); (3) Davis, Gunn, Needham, and Knibbs were charged with committing, and attempting to commit, the Wickham Robbery, in violation of Title 18, United States Code, Sections 1951 and 2 (Count Three); (4) Davis was charged with using, carrying, and discharging a firearm during the Elmont Robbery, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2 (Count Four); (5) Davis was charged with using and carrying a firearm during a crime of violence, the Elmont Robbery, and thereby murdering Stephanie Laing, in violation of Title 18, United States Code, Sections 924(j) and 2 (Count Five); (6) Davis, Gunn, Needham, and Knibbs, were charged with using, carrying, and discharging a firearm during the Wickham Robbery, and aiding and abetting another person in doing so, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2 (Count Six); (7) Davis, Gunn, Needham, and Knibbs, were charged with using and carrying a firearm during a crime of violence, the Wickham Robbery, and aiding and abetting the use, carrying, and possession of firearms, and thereby murdering Gary Grey, in violation of Title 18, United States Code, Sections 924(j) and 2 (Count Seven); and (8) Davis, Gunn, Needham, and Knibbs were charged with conspiracy to distribute and possess with intent to distribute marijuana, in violation of Title 21, United States Code, Section 846 (Count Eight). (Presentence Investigation Report dated August 9, 2010 ("Presentence Report" or "PSR") ¶¶ 1-10).

### B.     The Offense Conduct And The Defendant's Conviction

Davis was tried on all eight counts of the Indictment at a trial before this Court and a jury commencing on April 19, 2010, and concluding on May 3, 2010, when Davis was found guilty on all eight counts.

The facts surrounding Davis's criminal conduct are set forth in detail in the Government's July 9, 2010 Memorandum Of Law In Response To Defendants Alton Davis's And Roderick Gunn's Motions For Judgments Of Acquittal ("Govt. Mem.") and in the Presentence Report. (PSR ¶¶ 22-52). More significantly, this Court presided over the trial and is

The Honorable William H. Pauley III
August 17, 2010
Page 3

therefore extremely familiar with the facts. Accordingly, the Government will not repeat its factual summary. It should suffice to say that the Government believes that the evidence at trial overwhelmingly demonstrated that Davis was a member of a crew that committed armed robberies of suspected drug dealers, and that in two separate robberies Davis brutally shot and killed two people – Stephanie Laing and Gary Grey.

### C. The Defendant's Criminal History

Davis was convicted on or about October 29, 1992, in Rochester City Court, Rochester, New York, of attempted criminal possession of a weapon in the fourth degree. After Davis failed to appear and was re-apprehended, he was sentenced to 60 days' imprisonment. (PSR ¶ 96).

Davis was convicted on or about November 6, 1995, in Monroe County Court, New York, of perjury in the first degree, and was sentenced to 18 to 54 months' imprisonment. (PSR ¶ 98). The Presentence Report indicates that this conviction stemmed from Davis's testimony at a jury trial for assault in the first degree that he had "never possessed a gun" when in fact he had a prior conviction for gun possession. (PSR ¶¶ 99-100). The assault case resulted from Davis's ordering a cohort to shoot a victim with a .45 caliber handgun, causing serious physical injury. The Government submits that the Court can draw the inference that Davis's perjury had an impact on the outcome of the trial because the trial ended in a mistrial due to a hung jury. (PSR ¶¶ 113-14). Ultimately, Davis pleaded guilty to perjury in satisfaction of all of the charges. (PSR ¶¶ 99-100).

Davis also has pending charges in New York State Supreme Court, Kings County, for his possession of a firearm on or about March 20, 2007. In that case, Davis was involved in an altercation with another person and led the police on a chase. When he was arrested, the police recovered a loaded 9 mm handgun and a loaded Mac-90 handgun in Davis's vehicle. (PSR ¶¶ 106-07).

### D. The Applicable Sentences And Guidelines Calculation

The United States Probation Office ("Probation Office") identifies the maximum sentences applicable to Davis as follows. Pursuant to Title 18, United States Code, Section 1951, the maximum sentence for Counts One, Two, and Three is 20 years' imprisonment. (PSR ¶ 154).

Pursuant to Title 18, United States Code, Sections 924(c)(1)(A)(iii) and (c)(1)(C), the maximum term of imprisonment for Counts Four and Six is life imprisonment. Section 924(c)(1)(A) criminalizes the use or carrying of a firearm during and in relation to a crime of violence or a drug trafficking crime and imposes specified mandatory minimum terms of incarceration in addition to the punishment provided for the underlying crime "[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law." In United States v. Whitley, 529 F.3d 150 (2d Cir. 2008), the Second Circuit

The Honorable William H. Pauley III
August 17, 2010
Page 4

interpreted this "except" clause to mean that a mandatory minimum sentence prescribed under § 924(c) need not run consecutively to a greater mandatory minimum sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e). See id. at 153; see also United States v. Williams, 558 F.3d 166, 171 (2d Cir. 2009) (holding that the § 924(c) "except" clause applied to any greater mandatory minimum, including those prescribed in 21 U.S.C. § 841(b)(1)(A)). Based on Whitley and Williams, the Probation Office has taken the position that there is no mandatory minimum sentence for Count Four, but the second conviction under Section 924(c)(1)(A)(iii), (Count Six) requires a mandatory and consecutive sentence of 25 years' imprisonment. (See 18 U.S.C. § 924(c)(1)(C)). (PSR ¶ 154).

Pursuant to Title 18, United States Code, Section 924(j), the maximum term of imprisonment for Counts Five and Seven is life imprisonment. (PSR ¶ 154).

Pursuant to Title 21, United States Code, Sections 841(b)(1)(B) and 846, Count Eight carries a mandatory minimum sentence of 5 years' imprisonment and a maximum terms of 40 years' imprisonment. (See generally PSR ¶ 154).

The Probation Office recognizes that the Guidelines analysis in this case is driven by the fact that Davis committed two murders in the course of two robberies. The Probation Office broke the different robberies into different groups, as required by U.S.S.G. §§ 1B1.2(d) and 3D1.2(b). Group One consists of the counts related to the Elmont Robbery and the murder of Stephanie Laing (Counts One, Two, and Five). (PSR ¶ 71). Group Two consists of the counts related to the Wickham Robbery and the murder of Gary Grey (Counts One, Three, and Seven). (PSR ¶ 77). Each of these two groups has a base offense level of 43 because a victim was killed during the course of the robbery.[2] (PSR ¶¶ 71, 77). The other groups related to other robberies and the marijuana distribution conspiracy drop out of the analysis because their offense levels are nine or more levels less serious than Groups One and Two. (PSR ¶ 70, citing U.S.S.G. § 3D1.4(c)). Thus, because these groups would not ultimately affect the Guidelines range applicable to Davis, the Probation Office did not detail their computations. (PSR ¶ 70).

Applying the multiple count adjustment set forth in U.S.S.G. § 3D1.4, the Probation Office calculated the combined adjusted base offense level as 45. (PSR ¶¶ 82-88). The Probation Office specifically noted that Davis had testified that he did not participate in either the Elmont or Wickham robberies and that he did not kill Laing or Grey. Because the Court presided over the trial, the Probation Office deferred to the Court regarding whether a two-level enhancement is warranted for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. (PSR ¶¶ 75, 81). The Probation Office specifically noted that no adjustment for acceptance of responsibility was warranted because the defendant was convicted after trial, during which he

---

[2] Pursuant to U.S.S.G. § 2K2.4, the Guidelines range applicable to Counts Four and Six is the minimum term of imprisonment that the statute requires (which is set forth in Sections 924(c)(1)(A)(iii), and (c)(1)(C)). (PSR ¶ 68).

The Honorable William H. Pauley III
August 17, 2010
Page 5

testified that he was not involved in the offenses charged. (PSR ¶ 89).

According to the PSR, based on a total offense level of 45 and a Criminal History Category of III (PSR ¶¶ 95-102), the guidelines range applicable to Davis is life imprisonment, to be followed by a mandatory and consecutive term of 25 years' imprisonment. (PSR ¶ 155). The Probation Office recommends that the Court impose a total term of life imprisonment, to be followed by a consecutive term of 25 years' imprisonment.[3] (PSR, at page 35).

## DISCUSSION

The United States Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7). See Gall, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;

---

[3]   Specifically, the Probation Office recommends that Court sentence Davis to 20 years' imprisonment on each of Counts One, Two, and Three; life imprisonment on each of Counts Four, Five, and Seven; and 40 years' of imprisonment on Count Eight, all of which the Probation Office recommends run concurrently.

The Honorable William H. Pauley III
August 17, 2010
Page 6

      (C)    to protect the public from further crimes of the defendant; and

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita, 127 S. Ct. at 2463, and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 128 S. Ct. at 594; see also Rita, 127 S. Ct. at 2464; United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)). To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 128 S. Ct. at 597.

A.    **The Defendant Should Receive a Two-Level Increase for Obstruction of Justice**

The Government respectfully submits that the defendant's materially false false trial testimony under oath should be addressed by the Court at sentencing, and the defendant's offense level should be increased two-levels, from 45 to 47, pursuant to U.S.S.G. § 3C1.1.

Section 3C1.1 of the Sentencing Guidelines mandates a two-level upward adjustment of the offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. This provision applies to a defendant who commits perjury, or who provides "materially false information to a judge or magistrate." U.S.S.G. § 3C1.1, comment 4(b), 4(f).

As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty

memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993); cf. United States v. Hasan, 586 F.3d 161, 169 (2d Cir. 2009) (Section 3C1.1 enhancement "does not violate a defendant's constitutional right to testify in his own defense"). The Second Circuit held in United States v. Zagari, 111 F.3d 307 (2d Cir.1997), that before applying an obstruction enhancement based on providing false testimony, the sentencing court must find by a preponderance of the evidence "that the defendant (1) willfully (2) and materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." Id. at 329. Information is "material" when, "if believed, [it] would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. n. 6.

"Before imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" United States v. Lincecum, 220 F.3d 77, 80 (2d Cir. 2000) (quoting United States v. Case, 180 F.3d 464, 467 (2d Cir.1999)); see also United States v. Agudelo, 414 F.3d 345 (2d Cir. 2005) (denying the obstruction enhancement where there was no obvious lie); U.S.S.G. § 3C1.1, Application Note 2. In doing so, the court must "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." United States v. Dunnigan, 507 U.S. at 95; see also, e.g., Case, 180 F.3d at 467; United States v. Walsh, 119 F.3d 115, 121 (2d Cir. 1997).

In its findings, the sentencing court need not exhaustively parse the evidence, nor must the court "recite any magic words to assure that [it has] applied the appropriate standard." Walsh, 119 F.3d at 121. Rather, "[w]here the district court finds that the defendant has 'clearly lied' in a statement made 'under oath,' the court need do nothing more to satisfy Dunnigan than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." Lincecum, 220 F.3d at 80 (quoting United States v. Williams, 79 F.3d 334, 337-38 (2d Cir. 1996)); see also United States v. Catano-Alzate, 62 F.3d 41, 42 (2d Cir. 1995) ("[s]eparate findings of fact" are not required, so long as "a general finding of obstruction . . . tracks those factual predicates necessary to support a finding of perjury"). The Court may draw all reasonable inferences both from the words used and all of the relevant circumstances. See United States v. Reed, 88 F.3d 174, 179 (2d Cir. 1996) (court should "view the facts not piecemeal but in conjunction" in determining whether conduct was obstructive).

For sentencing purposes, perjury need only be proven by a preponderance of the evidence. See U.S.S.G. App. C, Amend. 566 (Nov. 1, 1997); see also United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003); United States v. Menting, 166 F.3d 923, 929 (7th Cir. 1999). Further, an upward adjustment for obstruction of justice is "mandatory once its factual predicates have been established." United States v. Ruggiero, 100 F.3d 284, 292 (2d Cir. 1996) (emphasis added) (citations and internal quotation marks omitted); see also Dunnigan, 507 U.S. at 98; United States v. Ortiz, 251 F.3d 305, 306 (2d Cir. 2001); United States v. Shonubi, 998 F.2d 84, 88 (2d Cir. 1993) (district court erred as a matter of law in declining to enhance sentence after having found factual predicate for obstruction of justice).

The Honorable William H. Pauley III
August 17, 2010
Page 8

Applying these standards, courts in this Circuit and in this District have applied the obstruction-of-justice enhancement under circumstances similar to those presented in this case. See, e.g., United States v. Berry, 38 Fed. Appx. 52, 55, 2002 WL 480559, at **2 (2d Cir. Mar. 29, 2002) (upholding enhancement for obstruction of justice following defendant's false trial testimony because "The version of events recited by Berry while under oath is fundamentally inconsistent with the government's evidence and with the guilty verdict, leading inexorably to the conclusion that Berry gave materially false testimony. Moreover, the extensiveness of the contradictions between Berry's testimony and the government's evidence supports the District Court's finding that Berry intended to give false testimony, and did not do so merely as a result of confusion or faulty memory."); United States v. Martinez-Rios, 143 F.3d 662, 678 (2d Cir. 1998) (upholding imposition of 2-level enhancement for obstruction of justice and refusal to accord a reduction for acceptance of responsibility where defendant submitted affidavit containing false statements in connection with sentencing); United States v. James Keye, 08 Cr. 607 (AKH) (S.D.N.Y. May 7, 2009) (imposting enhancement for obstruction of justice where defendant submitted false affidavit); United States v. Miguel Hinojoza-Quinones, 08 Cr. 242 (SAS)(S.D.N.Y. May 12, 2009) (imposing obstruction enhancement for false testimony at hearing but granting credit for acceptance of responsibility only because of extraordinary circumstances surrounding defendant's safety valve proffer); United States v. Renata Kuehl, 08 Cr. 64 (SCR)(S.D.N.Y. May 29, 2009) (imposing obstruction enhancement for defendant who provided false testimony at trial).

1. **False Testimony Concerning The Elmont Robbery And Murder Of Stephanie Laing**

The Government contends that Davis's testimony concerning the events of October 31, 2002, namely, his testimony that he was not involved in the Elmont Robbery and the murder of Stephanie Laing, was materially false. Davis testified as follows:

> Q. Now, I want to talk to you -- you heard there was a woman who was killed that morning, Stephanie Laing?
> A. Yes.
> Q. In Elmont, Long Island?
> A. Yes.
> Q. Did you shoot Stephanie Laing?
> A. No.
> Q. Were you involved in an attempted robbery that took place at 194 Locustwood Boulevard in Elmont?
> A. No.
> Q. Were you involved in planning a robbery or 194 Locustwood Boulevard?
> A. No.

(Trial Transcript ("Tr.") 1580: 25 to 1581: 12). In support of his claim that he was not involved

The Honorable William H. Pauley III
August 17, 2010
Page 9

in the murder, Davis concocted a false alibi and a phony story about how he was shot. In substance, Davis claimed that he was going to a store in Brooklyn when some unidentified individuals shot him. (See Tr. 1574-76).

Davis's testimony was belied by the evidence at trial, including (1) the testimony that Robert Deleon ("Deleon") shot an intruder in the shoulder during the course of the robbery (Tr. 246-47), coupled with the fact that Davis was treated for a gunshot wound that day (Tr. 358-60, 1102-03); (2) Derrilyn Needham's testimony that she was involved in planning the robbery and that Davis told her that he had been shot during the course of the robbery and had killed "Stephanie" (Tr. 387-88, 394-97); (3) the physical evidence establishing Davis's presence at the crime scene, including the evidence that DNA consistent with Laing's DNA was recovered from Davis's boots (Tr. 1354-58), DNA consistent with Davis's DNA was recovered from a cell phone earpiece found in front of the murder scene (Tr. 1361-63), and fibers consistent with Davis's sweater were recovered from Laing's nightgown (Tr. 1238-41); and (4) Special Agent Jason Zamaloff's testimony that Davis admitted in a post-arrest statement that he was present during the Elmont Robbery and that Davis had provided a host of details about the robbery, including the fact that Davis was shot during the robbery. (Tr. 1383-94).

In contrast to this evidence, Davis's story was unsubstantiated and was contradicted by all of the credible evidence in the case. Moreover, the jury clearly rejected Davis's phony story and convicted him of all of the counts charged against him that related to the Elmont Robbery. As in Berry, "the extensiveness of the contradictions between [the defendant's] testimony and the government's evidence supports the [] finding that [the defendant] intended to give false testimony, and did not do so merely as a result of confusion or faulty memory." Berry, 38 Fed. Appx. 52, 55, 2002 WL 480559, at **2. Nothing in his demeanor or testimony while on the witness stand suggests that Davis was confused or mistaken. To the contrary, Davis testified cogently and clearly articulated a story he had simply made up in a failed effort to avoid conviction. Nor can there be any serious dispute that the testimony related to a material matter because it was blanket denial of some of the central allegations in the case.

### 2. False Testimony Concerning The Wickham Robbery And The Murder Of Gary Grey

Davis provided the following materially false testimony concerning the Wickham Robbery and the murder of Gary Grey:

> Q. Did you have anything to do with the murder of Gary Gray?
> A. No.
> Q. Did you plan the murder of Gary Gray?
> A. No.
> Q. Did you plan to rob Gary Gray?
> A. No.

The Honorable William H. Pauley III
August 17, 2010
Page 10

> Q. Did you rob Gary Gray?
> A. No.

(Tr. 1591: 11-18). In his testimony, Davis claimed that he received word that his niece was with an "older man," traveled to a location in the Bronx where he met his niece, and took her with him to Massachusetts. (Tr. 1586-91).

This testimony was contradicted by the testimony of Needham and Knibbs concerning Davis's participation in the Wickham Robbery and the murder of Gary Grey (Tr. 399-415, 424-37, 745, 747, 755-65), as well as the in-court identification of Davis by robbery victim Mark Wright (Tr. 1170-72), all of which the jury clearly credited in convicting Davis of the charges related to the Wickham Robbery and the murder of Grey. Davis's testimony that he did not rob or kill Grey was also contradicted by Special Agent Zamaloff's testimony that Davis, after originally trying to tell the agents a story similar to the phony story that he told the jury, eventually admitted that he robbed and killed Grey. (Tr. 1396-1401, 1413).

The Government submits that the Court should find that Davis willfully perjured himself in testifying that he was not involved in the Wickham Robbery or the murder of Gary Grey. Davis plainly was not confused or mistaken. He was simply trying to talk his way out of trouble. Moreover, as with the false testimony concerning the Elmont Robbery, there cannot be any serious dispute that this testimony was material to the issues at trial.

### 3. False Testimony Concerning Davis's Post-Arrest Statement

Davis also falsely denied making a post-arrest statement to Special Agent Zamaloff:

> Q. Now, I believe there came a time when you were arrested and charged with the participation in these crimes, right?
> A. Yes.
> Q. Had you met Agent Zamaloff before then?
> A. No.
> Q. And is he one of the individuals who arrested you?
> A. Yes.
> Q. When he arrested you where did he take you?
> A. He took me to someplace in Brooklyn.
> <u>Q. During that car ride did you make a statement to Agent Zamaloff?</u>
> <u>A. No.</u>
> <u>Q. Did you admit that you had been involved in planning the robbery and homicide that night?</u>
> <u>A. No.</u>
> <u>Q. Did you admit you had shot Gary Gray?</u>

<u>A. No.</u>
<u>Q. Did you make any statements to Agent Zamaloff that day?</u>
<u>A. No.</u>

(Tr. 1591: 19 to 1592: 12)(false statements underlined). On cross-examination, Davis maintained that he did not make any of the statements that Agent Zamaloff attributed to him – even statements that purported to exculpate Davis or were consistent with Davis's trial testimony. (Tr. 1619-26, 1630-46). Davis's counsel argued on summation that Special Agent Zamaloff's testimony concerning the post-arrest statement was fabricated. (Tr. 1700, 1723-26).

As the jury clearly found in convicting Davis, the Court should find that Davis's testimony denying that he made any statements to Agent Zamaloff was willfully false. <u>Cf.</u> <u>United States</u> v. <u>Bonds</u>, 933 F.2d 152, 155 (2d Cir. 1991)(appropriate to regard the jury's verdict as having "necessarily determined" the falsity of a defendant's testimony when: (i) the defendant testified that he lacked guilty knowledge; and (ii) the jury subsequently convicts the defendant). Agent Zamaloff's testimony was credible, consistent, clear, and was backed up by the fact that he made notes of the interview by stepping out of the room to write down what Davis said. (Tr. 1378-79). The Court can easily find that Davis committed perjury solely on the basis of Agent Zamaloff's testimony.

In addition to Agent Zamaloff, the Government called Special Agent Charles Mulham, who also was present for the interview, to testify about Davis's statements. Agent Mulham's testimony was clear, credible, and directly supported Agent Zamaloff's version of the interview. Further, during his testimony, Agent Mulham reviewed Agent Zamaloff's handwritten notes and indicated that he had previously reviewed them the day of the interview and had made a correction to the notes. (Tr. 1272, 1282-83). Indeed, Agent Mulham – an ATF agent with many years of experience – described the interview as "memorable" because "we are talking about two homicides and some things you hear from people you don't forget." (Tr. 1283).

Under these circumstances, the Court should conclude that Special Agents Zamaloff and Mulham were testifying truthfully, and that Davis's contrary testimony constituted willful perjury. Davis's demeanor and the consistency of his denials that he made any statements whatsoever demonstrate that he was not mistaken in his testimony. Moreover, the fact that Davis's attorney attacked Agent Zamaloff's credibility on summation illustrates the materiality of Davis's false testimony.

Accordingly, the Government respectfully requests that the Court find that Davis willfully and materially committed perjury in connection with the above-cited specific testimony and impose a two-level enhancement pursuant to U.S.S.G. § 3C1.1. We recognize that this finding will not impact Davis's Guidelines range, which will remain life imprisonment in either case. However, the Government suggests that it would be contrary to the interests of justice not to address Davis's blatant perjury because the failure to address Davis's perjury sends a message to Davis and to other defendants that there are limited repercussions for giving false testimony.

The Honorable William H. Pauley III
August 17, 2010
Page 12

This is especially so given that Davis has a prior history of testifying falsely in a criminal trial where, unlike here, it worked and he was able to secure a hung jury.

**B.     The Court Should Sentence Davis To Life Imprisonment**

Consistent with the Probation Office's recommendation, the Court should sentence Davis to life imprisonment on each of the murder counts. Davis is subject to an extremely severe sentence, and rightly so. The evidence at trial overwhelmingly established that Davis committed a string of armed robberies and that, in the course of two of his robberies, Davis callously murdered Stephanie Laing and Gary Grey.

At the time of her death, Stephanie Laing was 36 years old, and was the mother of four children – two then college-age daughters, a then nine-year-old daughter, and a then five-year-old son. The circumstances of this crime were horrifying. Davis and his crew stormed the house as the children were getting ready for school. Indeed, Davis followed Ms. Laing's daughter into the house. As the Court heard from eyewitness Eneta Brown, Laing was shot twice at point blank range as she lay on the floor attempting to fend off Davis's assault. The murder was heartless and unnecessary. Moreover, even after brutally killing Laing, Davis was not finished. As the Court heard, Davis then turned his attention to Brown – a woman of advanced years – and tried to shoot her. As Davis later boasted to Needham, he would indeed have killed Brown but for the fact that the gun jammed.

The murder of Gary Grey was similarly horrific. At the time of his death, Gary Grey was 36 years old, and was the father of seven children, who now range in age from 12 to 25 years old. The evidence at trial established that Davis cold-bloodedly decided the night before the robbery that he would kill Grey. Moreover, Davis executed Grey while Grey's hands and feet were tied, which demonstrates the callous nature of the murder.

The Government submits that a sentence of life imprisonment is necessary to sufficiently reflect the seriousness of these offenses, to promote respect for the law, and to afford adequate deterrence to criminal conduct. See 18 U.S.C. § 3553(a)(2)(A). Davis was engaged in the violent business of robbing drug dealers and heartlessly murdered two people. Indeed, his dangerous nature was evident from the testimony that, but for the circumstance that his gun jammed, Davis would have killed Eneta Brown. Moreover, when Davis was arrested in 2007, he had two loaded handguns in his possession.

Davis has been convicted of the most serious of crimes, and society must be protected from him. Nothing short of a life sentence will be adequate to protect society from so dangerous an offender.

### 3. The Sentences On The Murder Counts Should Be Consecutive To The Sentences On the Other Counts

Davis was convicted of an offense under 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 924(j)(1) for the murders of Laing and Grey. The Government agrees with the defense that these counts "merge" because the Section 924(c)(1)(A)(iii) count is a lesser included offense of the corresponding Section 924(j) count. Accordingly, Davis should be sentenced on the Section 924(j) counts, Counts Five and Seven, and should not be sentenced on the Section 924(c) counts, Counts Four and Six. See United States v. Parkes, 497 F.3d 220, 234 (2d Cir. 2007) ("because 18 U.S.C. § 924(c) is a lesser included offense of 18 U.S.C. § 924([j])(1), the district court erred by imposing sentences on both"), citing Rutledge v. United States, 517 U.S. 292, 306-07 (1996).

As set forth above, each of Counts Five and Seven warrants a sentence of life imprisonment. Moreover, the sentences on Counts Five and Seven should run consecutively to each other, and to the sentences for Davis's other convictions. Section 924(c) requires that any sentence imposed for using, carrying, or discharging a firearm during and in relation to a crime of violence must be "in addition to the punishment provided for such crime," 18 U.S.C. § 924(c)(1), and that "[n]otwithstanding any other provision of law . . . no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(D)(ii). Section 924(j) is the penalty provision for persons who aggravate their Section 924(c) offense by killing someone with a firearm in the course of their 924(c) offense. Accordingly, courts have held that, viewed in the context of Section 924(c), "[t]he plain meaning of the words used in Section 924(j) unequivocally provide that if the evidence shows a violation of § 924(c) (i.e., the use or carrying of a firearm in the commission of a crime of violence or a drug trafficking crime), a district court must impose a consecutive sentence over and above the punishment prescribed for the violent crime." United States v. Battle, 289 F.3d 661, 666 (10th Cir. 2002); accord United States v. Hatten, No. 06-4240, 2007 WL 1977663 (4th Cir. July 5, 2007). Indeed, in light of Section 924(c)'s clear directive that the punishment under that section be consecutive to the punishment for the underlying crime of violence, a non-consecutive sentence "would lead to the odd result that a defendant convicted under § 924(c) is subject to an additional consecutive sentence only in situations that do not result in a death caused by use of the firearm." Battle, 289 F.3d at 668 (quoting United States v. Allen, 247 F.3d 741, 769 (8th Cir. 2001)). Such a bizarre result would conflict with Congress's clear intent to mandate additional punishment where a defendant uses a firearm in connection with a crime of violence.

Moreover, in any event, consecutive sentences should be imposed in the exercise of the Court's discretion. Title 18, United States Code, Section 3584(a), generally provides the district court with discretion to determine whether a sentence should run concurrently or consecutively to a previously imposed sentence. See 18 U.S.C. § 3584(a) ("If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is

The Honorable William H. Pauley III
August 17, 2010
Page 14

imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively.")

A district court's determination to order that a sentence run consecutively to an undischarged sentence for an unrelated crime is reviewed under the abuse of discretion standard. See United States v. Velasquez, 136 F.3d 921, 923-24 (2d Cir. 1998). So long as the district court understood its authority to impose a concurrent sentence, and considered the appropriate penalty in light of the relevant factors, the sentencing judge's determination to impose a consecutive sentence should be upheld. See, e.g., Velasquez, 136 F.3d at 923-25; United States v. McCormick, 58 F.3d 874, 878 (2d Cir. 1995); United States v. Lagatta, 50 F.3d 125, 128 (2d Cir. 1995).

In this case, the Court should exercise its discretion and run the sentences for Davis's murder convictions consecutively to each other and to the sentences imposed on the other counts of conviction. We recognize, of course, that two consecutive life sentences is largely symbolic. Nevertheless, it is appropriate here to take into account the fact that Davis killed two separate people, each of whom is entitled to have his or her murderer brought to justice.

## CONCLUSION

The Government respectfully requests that the Court increase the defendant's offense level by two-levels for obstruction of justice. Further, the Government respectfully requests that the Court sentence the defendant to two sentences of life imprisonment, to run consecutively to each other and to the sentences imposed on Davis on the other counts of conviction.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: ~~John~~ J. O'Donnell
Jennifer E. Burns
Assistant United States Attorneys
(212) 637-2490/2315

cc:   Via Telecopier and E-Mail
      Allan Haber, Esq.
      Stephanie Carvlin, Esq.
      USPO Emily Frankelis